**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CRYSTAL BRAMAN,**

     **Plaintiff,**

v.                          **Case No.: 2:18-cv-00322**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the

1

Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On February 26, 2014, Plaintiff, Crystal Braman ("Claimant"), completed an application for DIB, alleging a disability onset date of December 20, 2013 due to "arthritis, burned right hand, spondylosis, depression, bipolar, [and] fibromyalgia." (Tr. at 183-84, 207). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 97-101, 104-10). Claimant filed a request for an administrative hearing, which was held on March 10, 2017 before the Honorable Donna J. Grit, Administrative Law Judge ("ALJ"). (Tr. at 42-68). By written decision dated May 3, 2017, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-41). The ALJ's decision became the final decision of the Commissioner on December 18, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 10, 11). Consequently, the issues are fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 36 years old on her alleged onset date and 39 years old on the date of the ALJ's decision. She completed high school and communicates in English. (Tr. at 206, 208). Claimant previously worked as a preschool teacher, bartender, and home health aide. (Tr. at 63-64, 208).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed

4

mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 20, 2013, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "cervical degenerative disc disease; bilateral knee osteoarthritis/bilateral patellofemoral syndrome; obesity; generalized anxiety disorder/panic disorder; [and] bipolar disorder." (*Id.*, Finding No. 3). The ALJ also considered Claimant's fibromyalgia, but found that it was not a medically determinable impairment. (Tr. at 17). The ALJ further considered Claimant's gastroesophageal reflux disease, excoriation disorder, hypertension, renal stones/colic, carpal tunnel syndrome, conversion disorder, and right hand burn, but determined that these impairments were non-severe. (Tr. at 17-18). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: lifting and carrying 10 pounds occasionally, less than 10 pounds frequently; sitting for eight hours and standing and/or walking for two hours out of an eight-hour workday; pushing and pulling as much as can lift and carry; use of a cane would be permitted for ambulation; never climbing ladders, ropes or scaffolds; never crawling; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling and

5

crouching; no more than occasional exposure to extremes of heat and cold; no exposure to unprotected heights or dangerous moving machinery; limited to understanding, remembering and applying information to perform simple tasks, make simple decisions, and adapt to occasional changes in workplace routine.

(Tr. at 21-33, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any of her past relevant work. (Tr. at 33, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 33-35, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1977 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 33-34, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled work as a bench assembler, inserter, or parts checker at the sedentary exertional level[1]. (Tr. at 34-35, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and thus was not entitled to benefits. (Tr. at 35, Finding No. 11).

## IV.  **Claimant's Challenge to the Commissioner's Decision**

Claimant presents two challenges to the Commissioner's decision. First, Claimant

---

[1] The ALJ mistakenly referred to the "parts checker" job as being light exertional work, contrary to the Dictionary of Occupational Titles, which lists it as sedentary work. *See* DOT No. 669.687-014.

6

argues that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to account for Claimant's moderate limitations in concentration, persistence, or pace in the RFC analysis. (ECF No. 10 at 2-4). Claimant primarily relies on the decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), in support of her first argument. (*Id.* at 3-4). Second, Claimant contends that the ALJ failed to include any manipulative limitations in her RFC, or explain why such limitations were not warranted despite evidence in the record that, according to Claimant, substantiated such limitations. (*Id.* at 4-5). Claimant notes that Social Security Ruling ("SSR") 96-8p requires adjudicators to discuss how the evidence supports the RFC assessment and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. (*Id.* at 4).

In response to Claimant's first challenge, the Commissioner points out that Claimant initially denied having any psychiatric component to her disability claim and did not list issues with concentration, understanding, remembering, or following instructions in her Social Security paperwork. (ECF No. 11 at 3-4). Moreover, the Commissioner notes that the only evidence of an alleged concentration deficit is contained in the report of Claimant's one-time consultative examination, whereas the documentation of Claimant's numerous other mental status examinations reflect that her concentration and overall mental status are entirely normal. (*Id.* at 4-5). The Commissioner argues that Claimant's case is readily distinguishable from *Mascio* because the ALJ very thoroughly and specifically focused on Claimant's mental limitations that were supported by the record and assessed appropriate restrictions, in addition to a restriction to simple, unskilled work. (*Id.* at 7-8). The Commissioner asserts that Claimant alleged difficulties handling stress and changes in the work setting, and the ALJ thus

assessed specific RFC restrictions to account for those particular problems within the broad functional area of concentration, persistence, or pace. (*Id.* at 8). In fact, the Commissioner argues that the ALJ specifically complied with the mandate in *Mascio*, which is to "follow the facts, evaluate them, and explain them." (*Id.* at 9).

As to Claimant's second challenge that the ALJ should have assessed manipulative limitations, the Commissioner responds that the evidence showed only that Claimant sustained a very mild burn on her right hand that did not cause any long-term limitations and that she had mild carpal tunnel syndrome. (*Id.* at 5-6, 10-12). The Commissioner adds that none of Claimant's treating providers found Claimant to have disabling mental or physical impairments, nor did any of the agency consultants. The Commissioner maintains that the ALJ analyzed the record and crafted an RFC that reflected a fair accounting of Claimant's functional impairments, which was supported by substantial evidence. (*Id.* at 4-6).

## V.    Relevant Evidence

The undersigned has reviewed all evidence of record and summarizes the evidence that is most relevant to the issues in dispute below:

### A. Treatment Records

On September 9, 2013, Claimant began seeing nurse practitioner, Melissa Lambert, at Cabin Creek Health Center, Inc. Claimant related that she was under a lot of emotional stress, as she recently "lost her house"; her family cut off communication with her; and she was having "chronic issues," including bipolar disorder, depression, and back pain. (Tr. at 342). Claimant stated that she was not taking any medications, because she lost her job and insurance coverage. (*Id.*). Ms. Lambert prescribed Ultracet for Claimant's back pain, Lamictal for bipolar disorder, amitriptyline for fibromyalgia, and Klonopin for

anxiety. (Tr. at 343-44). Claimant followed up with Ms. Lambert later that month, on September 24, 2013, and reported that her anxiety and depression were "doing better." (Tr. at 339). Claimant stated that she was doing fine in terms of her chronic pain, but she still complained of increased pain and tingling in her left arm. (*Id.*).

On December 21, 2013, Claimant presented to the emergency room at Charleston Area Medical Center, stating that she had burned her right hand while making rock candy. (Tr. at 278). She was evaluated by a physician's assistant and assessed to have a partial thickness burn on approximately two percent of her hand and blisters that had popped on the dorsal aspect of her hand. (*Id.*). Claimant was prescribed Norco for pain and bacitracin ointment to prevent infection. (Tr. at 279). She was advised to change the dressing on her hand daily and follow up with the Cabell Huntington Hospital burn unit. (*Id.*).

On December 30, 2013, Claimant presented to family nurse practitioner, Debra Mooney, at New River Family Health Center for mental health treatment, stating that she was feeling anxious and nervous, but that her primary care physician would not write her a prescription for Klonopin. (Tr. at 292). Claimant reported that she was moody and irritable, although her depression was fair. (*Id.*). Claimant's objective mental status examination revealed normal results. (*Id.*). Nevertheless, Claimant was diagnosed with major depressive disorder, panic disorder, and generalized anxiety disorder. (*Id.*). She was prescribed Klonopin, continued on amitriptyline, and prescribed an increased dosage of Lamictal. (*Id.*).

On January 2, 2014, Claimant saw Curtis Harrison, M.D., at the Center for Wound Healing at Cabell Huntington Hospital for follow-up care regarding the burn on her right hand. Dr. Harrison recorded that the small burn was healed and there was no sign of

9

infection. (Tr. at 438). Claimant had minimal edema in her hand and fingers. (Tr. at 439). Dr. Harrison assessed that it was a "minimal burn for the amount of pain [Claimant was] complaining of." (*Id.*). Noting that Claimant was already on Lortab for other issues, Dr. Harrison prescribed bacitracin ointment and scheduled Claimant to return in ten days. (*Id.*).

Claimant saw Ms. Lambert on January 14, 2014 and related that she started physical therapy a day earlier due to the decreased sensation and range of motion in her right hand secondary to the burn that she suffered a few weeks earlier. (Tr. at 332). On examination, Claimant had limited range of motion in her right hand and fingers and reduced sensation in the median/ulnar portion of her right hand, but she had normal motor strength and tone; no contractures, malalignment, tenderness, bony abnormalities, or cyanosis; and she could perform the finger-to-nose test. (Tr. at 333). Ms. Lambert documented that the second-degree burn on Claimant's hand was healing. (*Id.*).

Claimant presented to Ms. Lambert again on January 23, 2014 for routine follow up and medication refills. (Tr. at 325). Claimant stated that she "filed for disability" because of the burn on her hand. (*Id.*). Claimant stated that she was participating in physical therapy, but that she still could not use her right hand to complete activities of daily living. (*Id.*). Claimant stated that her depression and anxiety had improved since her boyfriend got a job and she had less to "worry about." (*Id.*). On examination, Claimant had good judgment; she was active, alert, and oriented in all spheres; her mood, affect, and memory were normal; and her sensation was grossly intact. (Tr. at 326). Claimant was prescribed Ultracet for the burn on her hand. (Tr. at 327).

On February 24, 2014, Claimant again saw Ms. Mooney regarding depression,

anxiety, and panic disorder. (Tr. at 283). Claimant was taking Klonopin, amitriptyline, and Lamictal, which she stated helped to relieve her symptoms. (*Id.*). Claimant complained that she had no feeling in her hand since she burned it and stated that her primary care provider suggested she seek disability benefits. (*Id.*). However, Claimant told Ms. Mooney that she was not seeking disability on "psychiatric terms." (*Id.*). There were no issues on Claimant's mental status examination and she was continued on medications. (*Id.*).

On April 24, 2014, Claimant saw Ms. Lambert for another regularly-scheduled appointment. (Tr. at 320). Claimant stated that her depression was worse due to limited mobility related to neck and knee pain. (Tr. at 321). Ms. Lambert suggested that Claimant discuss the depression with her mental health provider. (*Id.*). Claimant advised Ms. Lambert that she was unable to complete activities of daily living on her own. (Tr. at 322). Ms. Lambert noted that she saw no reason why, if Claimant was given physical therapy and encouraged to complete tasks, that Claimant could not be caring for herself. (*Id.*). Ms. Lambert stated that there was no incident, other than the burn to Claimant's right hand, that should have impaired Claimant's ability to complete activities of daily living. (*Id.*).

On May 19, 2014, Claimant told Ms. Mooney during her regular monthly appointment that amitriptyline was not working for her and she was depressed, irritable, and moody. (Tr. at 404). Claimant stated that Effexor worked for her in the past. (*Id.*). Thus, Claimant was prescribed Effexor in place of amitriptyline and her prescriptions for Klonopin and Lamictal were renewed. (*Id.*). Claimant's diagnoses remained recurrent, moderate major depression; panic disorder; and generalized anxiety disorder. (*Id.*). On examination, Claimant was neat, tidy, cooperative, appropriately groomed, alert, and oriented in all spheres. (*Id.*). Her mood was euthymic, her affect was broad, her thoughts

were logical, and her speech and psychomotor activity were normal. (*Id.*).

 At Claimant's next appointment with Ms. Mooney on June 4, 2014, Claimant expressed that Klonopin was not helping her and she continued to have mood swings. (Tr. at 405). Claimant also complained of "anger problems, nervousness, fear of thunder storms, throwing things, agitation, and generalized drama." (*Id.*). However, Claimant stated that her depression was under control. (*Id.*). Claimant was prescribed Valium in place of Klonopin, she was continued on Effexor; her dosage of Lamictal was increased; and she was additionally prescribed Abilify. (*Id.*). Her diagnoses remained the same and her mental status examination was again normal. (*Id.*).

On July 2, 2014, Claimant presented to Ms. Mooney "acting as if she [could] barely walk, moaning and crying." (Tr. at 406). She was accompanied by two people, who were carrying her around. (*Id.*). In terms of her mental health, Claimant stated that she was extremely depressed and could not function. (*Id.*). She told Ms. Mooney that Effexor was not working, and Abilify caused her a rash. (*Id.*). Thus, her prescription for Abilify was discontinued and her prescription for Effexor was gradually decreased and discontinued. (*Id.*). Claimant was to continue taking Valium and Lamictal and she was additionally prescribed Geodon. (*Id.*).

Claimant returned to Ms. Mooney's office on July 9, 2014, reporting that she was doing better following the adjustments to her medications. (Tr. at 407). Claimant's objective mental status examination revealed no issues. (*Id.*). Her diagnoses included moderate-to-severe recurrent major depression and generalized anxiety disorder. (*Id.*). Claimant was continued on medications. (*Id.*).

On July 30, 2014, Claimant told Ms. Mooney that she had been doing better over the past month and that medication was helping her. (Tr. at 408). She was reportedly less

irritable and anxious with a better mood. (*Id.*). Her objective examination again did not reveal any issues and she stated that she did not have any side effects from her medications. (*Id.*). Claimant's diagnoses remained the same and her prescriptions were renewed. (*Id.*).

On June 10, 2014, Claimant told Ms. Lambert that her chief complaints included acute pain in her right hand and right knee, bed wetting, weakness in her knees, and headaches. (Tr. at 362). She was fully oriented with normal short-term memory. (*Id.*). She was prescribed medication for headaches, but there was no assessment or treatment noted regarding her right hand. (Tr. at 363). When Claimant followed up with Ms. Lambert on July 14, 2014, Claimant stated that she was doing well. (Tr. at 358). Her assessed conditions included headaches, chronic back pain, reflux, and allergies. (Tr. at 359).

On June 13, 2015, Claimant presented to the emergency room at Borgess Medical Center in Kalamazoo, Michigan complaining of intermittent episodes of lightheadness, dizziness, and passing out since she slipped in the shower four days earlier and hit her head. (Tr. at 489). CT scans of Claimant's head, neck, and chest, as well as a brain MRI and EEG, were negative for any issues. (Tr. at 506). Nevertheless, Claimant was admitted to the hospital. Due to her history of bipolar disorder, reported dizziness and passing out, and negative neurological testing, Claimant was evaluated by resident psychiatrist, Michael Yuan, M.D., and attending psychiatrist, Kevin A. Kunzer, M.D., on June 16, 2015. (Tr. at 484, 503). Claimant reported that she had recently moved to Michigan from West Virginia in January and was anxious, depressed, and increasingly stressed now that she was living in a three-bedroom trailer that at times was occupied by four adults and four children. (Tr. at 484-85). Claimant stated that she could not concentrate and had

decreased energy, but she related that she "played Facebook all day." (Tr. at 485). Claimant stated that she was not receiving any psychiatric treatment since moving to Michigan. (*Id.*). Claimant's diagnoses included depression and anxiety, not otherwise specified; altered mental status/near syncope that was of unclear/multifactorial etiology; and conversion disorder, secondary to multiple psychosocial stressors. (Tr. at 503). Claimant was continued on her prior psychiatric medications. (*Id.*). Dr. Kunzer noted that Celexa at a certain dosage can induce near syncope episodes and that tapering the medication was something to consider in the future. (*Id.*).

On February 24, 2016, Claimant reestablished care with Ms. Lambert after moving back to West Virginia. (Tr. at 531). Claimant stated that she was doing well and was taking Pristiq, which she was tolerating well. (*Id.*). Claimant denied having any mood or sleep problems, myalgia, weakness, or stiffness. (*Id.*). However, on May 24, 2016, Claimant followed up with Ms. Lambert regarding, *inter alia*, a new complaint of numbness and tingling in the outer edges of her hands and feet. (Tr. at 527). Ms. Lambert recommended an EMG. (*Id.*). Claimant's mood was stable on her current medications, which included Lamictal and Pristiq. (Tr. at 527-28). Claimant followed up with Ms. Lambert on August 2, 2016 regarding numbness and tingling in the outer edges of her feet and hands, as well as other issues. (Tr. at 523). Ms. Lambert noted that Claimant had an EMG, which showed only mild carpal tunnel syndrome. (*Id.*).

On August 18, 2016, Claimant presented to Prestera Center for a mental health assessment. (Tr. at 571). She reported to counselor Justin Gibson that she was depressed, primarily related to her lack of relationships with her parents and two of her daughters, as well as due to her numerous physical ailments. (Tr. at 571-72). She stated that she had low energy, disrupted sleep and appetite, and lack of interest in doing things over the past

14

two to three years. (Tr. at 571). However, it was noted that Claimant did not have any trouble understanding, concentrating, or remembering, and her attention/concentration was noted to be focused. (Tr. at 571, 583). Claimant did not feel that her current medications, Lamictal and Pristiq, were effective. (Tr. at 573). Claimant was scheduled to see nurse practitioner Kadara Wade for a psychological evaluation on the following day. (Tr. at 580). Claimant's mental status examination by Ms. Wade on August 19, 2016 was normal, other than her anxious mood, including the fact that Claimant exhibited intact concentration, calculation, and memory. (Tr. at 547). Ms. Wade assessed that Claimant suffered from persistent depressive disorder and problems related to living in her friend's home with three other adults and four children. (Tr. at 548). Ms. Wade renewed Claimant's prescription for Lamictal and planned to wean Claimant off of Pristiq and prescribe Lexapro in its place because Claimant stated that Pristiq did not seem to help her. (Tr. at 549).

Claimant followed up with Ms. Wade on September 13, 2016. (Tr. at 561). Claimant stated that she continued having trouble sleeping because her mind raced at night with thoughts of her daughters. (Tr. at 561). However, her mood was somewhat improved. (*Id.*). Claimant's mental status examination was normal, including good attention/concentration. (Tr. at 562). Claimant was continued on Lexapro and additionally prescribed Remeron for sleep issues and depression. (Tr. at 564). Claimant was now willing to pursue individual therapy and it was noted that she would be referred to a therapist. (*Id.*).

On November 10, 2016, Claimant reported to Ms. Wade during her regularly-scheduled appointment that her mood was doing well and, although she rated her depression seven on a ten-point scale, she was excited about Christmas, which was a time

of year that she was usually depressed. (Tr. at 566). Claimant stated that she was sleeping well following the addition of Remeron to her medication regimen. (*Id.*). Her mental status examination did not reveal any issues, including good attention/concentration, and she was noted to be improving. (Tr. at 567, 569).

### B. Evaluations and Opinions

On October 21, 2014, Sunny S. Bell, M.A., conducted a mental consultative examination of Claimant. Claimant's hands were noted to tremble during the examination. (Tr. at 419). Claimant stated that she could not work due to a host of pain complaints, including, in part, right hand pain following her burn injury and she also complained of depression and problems concentrating. (Tr. at 420). Claimant's concentration was noted to be severely deficient based upon the Serial 3s test, [2] but her pace and persistence were within normal limits. (Tr. at 423-24). Ms. Bell assessed that Claimant with unspecified bipolar disorder, panic disorder, generalized anxiety disorder, and excoriation disorder. (Tr. at 423).

On November 8, 2014, Debra Lilly, Ph.D., performed a psychiatric review technique based upon a review of Claimant's records, including Claimant's consultative examination. Dr. Lilly concluded that Claimant had mild restriction in activities of daily living and moderate restrictions in social functioning and maintaining concentration, persistence, or pace. (Tr. at 83). Dr. Lilly assessed that Claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms; perform at a

---

[2] This test asks the patient to subtract 3 from 20, then from 17, 14, 11, 8, 5. https://fpnotebook.com/Neuro/Exam/Srl7s.htm

consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. (Tr. at 87-88). However, Dr. Lilly stated that Claimant's concentration difficulties were only assessed based upon her performance on the Serial 3s test. (Tr. at 88). Dr. Lilly specifically noted that concentration issues were not identified elsewhere in observations of the Claimant or in Claimant's allegations. (*Id.*). Dr. Lilly further stated that Claimant's pace was limited by her morbid obesity and pain complaints. (*Id.*). Therefore, Dr. Lilly assessed that Claimant should be limited to work settings without production demands and that required only routine, repetitive work-like activities. (*Id.*). Due to Claimant's reported irritability, Dr. Lilly also concluded that Claimant should not frequently work with the general public. (Tr. at 89).

On November 17, 2014, Uma Reddy, M.D., assessed Claimant's physical RFC based upon a review of Claimant's records. Dr. Reddy concluded that Claimant could perform work at the light exertional level except that Claimant could never climb ladders/ropes/scaffolds or crawl; could perform other postural activities occasionally; and should avoid concentrated exposure to temperature extremes, vibration, and hazards. (Tr. at 85-87). Dr. Reddy found that Claimant did not have any manipulative limitations. (Tr. at 86).

### C. Claimant's Statements

Claimant testified at her administrative hearing on March 10, 2017 that she lived in a home with her boyfriend, her nearly 13-year-old daughter, two other adult friends, and two other children. (Tr. at 47). In terms of physical impairments, Claimant stated that she had pain and instability in her knees, particularly her right knee. (Tr. at 54). She stated that she fell two or three times every two weeks, wore a right knee brace for the last several years, and used a cane every day. (*Id.*). Claimant stated that she also used a walker at

17

home. (*Id.*). She testified that she could stand for "five minutes, if that" before she became wobbly and would fall and that she could only sit for five to 10 minutes because of pain. (Tr. at 55, 60). Claimant also reported neck pain that radiated into her shoulders, particularly her left shoulder. (Tr. at 55). In terms of emotional issues, Claimant stated that she did not want to be around people when she was depressed and when she was around a group of people, she became very anxious. (Tr. at 56). Claimant testified that in a typical day, she watched Netflix or a movie and ate. (Tr. at 57-58). She stated that she was basically unable to cook or do chores because she could not lift or stand steadily. (*Id.*).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such

18

decision." *Blalock*, 483 F.2d at 775.

## VII.   __Discussion__

Claimant's challenges to the Commissioner's decision focus on the ALJ's RFC assessment. RFC is a claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the most that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* The ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The ALJ must consider the claimant's physical abilities, including any manipulative restrictions, as well as the claimant's mental abilities and any other abilities affected by the claimant's impairment(s).  20 CFR § 404.1545(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In terms of mental impairments, SSR 96-8p explains that the ALJ's ratings in the broad paragraph B mental function categories at steps two and three of the sequential evaluation, such as a finding of a moderate limitation in concentration, persistence, or pace, are not an RFC assessment, but are rather used to rate the severity of the mental impairments. *Id.* The mental RFC assessment, by contrast, is a more detailed assessment of the claimant's abilities to perform work-related functions. *Id.* The Ruling provides that the work-related mental activities that are generally required by competitive, remunerative work include the abilities to:

- understand, carry out, and remember instructions;

- use judgment in making work-related decisions;

- respond appropriately to supervision, co-workers and work situations; and

- deal with changes in a routine work setting.

*Id.* at *6.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A.  *Moderate Limitation in Concentration, Persistence, or Pace*

Claimant states that the ALJ's RFC finding, which restricted her to simple tasks

and decisions and occasional changes in workplace routine, did not account for her moderate limitation in concentration, persistence, or pace. Claimant asserts that the ALJ should have assessed appropriate limitations or explained why further restrictions were not warranted. For support, Claimant primarily relies on the Fourth Circuit's decision in *Mascio*, 780 F.3d 632.

In *Mascio*, the ALJ found at step three of the disability determination process that the claimant experienced moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental RFC restrictions in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were unskilled, the Fourth Circuit found this to be insufficient to account for the claimant's moderate mental limitations and held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Court indicated that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."[3] *Id.* Because the ALJ failed to either include any mental restriction in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth Circuit found that remand was appropriate. *Id.*

In this case, the ALJ found at step three that Claimant experienced moderate limitations in two areas of mental functioning: (1) understanding, remembering, or

---

[3] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3).

applying information and (2) maintaining concentration, persistence, or pace. (Tr. at 20). The ALJ cited Claimant's allegations of fatigue; decreased energy; sleep disturbance; and difficulty in concentrating, completing tasks, handling stress, and handling changes in routine. (*Id.*). However, the ALJ stated that, despite such limitations, Claimant was able to raise a daughter, secure public assistance and child support, drive for short distances, watch Netflix, spend the day on Facebook, play cards and board games with her daughter, attend her daughter's school conferences, and maintain her medical care with providers. (*Id.*). Further, the ALJ cited that Claimant's mental status examinations were routinely normal, including focused attention and concentration. (*Id.*). In addition, the ALJ found it compelling that Claimant had no difficulty understanding treatment recommendations, maintaining conversation in the treatment setting, or asking appropriate questions of her medical providers. (*Id.*). The ALJ remarked that Claimant also attended her administrative hearing and answered questions appropriately with no evidence of any difficulty understanding and attending to the content of the hearing. (*Id.*).

In the RFC discussion, the ALJ articulated a detailed analysis of Claimant's psychiatric treatment and the various opinions relating to Claimant's mental RFC. (Tr. at 28-32). The ALJ noted that Claimant's mental health problems primarily related to psychosocial and physical stressors, such as unemployment, relationship issues, and pain symptoms. (Tr. at 28). The ALJ acknowledged that Claimant's concentration was severely deficient during her October 2014 consultative examination by psychologist Ms. Bell, as Claimant made over four errors while performing the Serial 3s test. (Tr. at 30). However, the ALJ noted that Ms. Bell found Claimant's persistence and pace to be normal. (*Id.*). The ALJ stated that based on the medical evidence; Ms. Bell's own examination, including Claimant's results on the Serial 3s test and recent memory testing; and the effects of

Claimant's obesity and other physical symptoms and limitations, the ALJ found that Claimant's persistence and pace was indeed lower than normal. (*Id.*).

The ALJ also considered the November 2014 opinion of the state agency psychologist, Dr. Lilly. (Tr. at 32). Dr. Lilly assessed that Claimant was limited to work settings that did not include production demands; required only routine, repetitive work-like activities; and did not involve frequent contact with the general public. (Tr. at 88-89). However, the ALJ considered that Dr. Lilly clearly stated that Claimant's reported concentration difficulties were based solely on her performance on a single Serial 3s test during the consultative examination and were not identified elsewhere in observation of Claimant or in Claimant's complaints. (Tr. at 88). Further, Dr. Lilly explained that the assessed limitation that Claimant could not work in a position that required frequent contact with the general public was based only on Claimant's claimed irritability. (Tr. at 89). Weighing this evidence, the ALJ concluded that the limitation to "no production requirements" was extreme and, as Dr. Lilly stated, it was based upon a one-time test and not replicated elsewhere in the record. (Tr. at 32). Rather, as noted by the ALJ, Claimant consistently exhibited a stable mental status on examinations throughout the record. (*Id.*).

The ALJ again took note of the fact that Claimant's mental health treatment was routine and minimal, consisting primarily of psychotropic medications, which Claimant reported to be helpful. (*Id.*). The ALJ cited significant evidence that Claimant's mental status examinations were largely normal, including findings of focused attention and concentration and intact memory. (*Id.*). Further, the ALJ considered that Claimant performed a variety of daily activities, including watching television, spending the day on Facebook, shopping, managing her own finances, attending school conferences, playing

board games and cards, and moving between West Virginia and Michigan. (Tr. at 33).

Nevertheless, like Dr. Lilly, the ALJ credited Claimant's allegations that she had difficulty maintaining concentration, persistence, or pace. (Tr. at 32). After weighing and reconciling all of the evidence, including Claimant's allegations, consultative examination, and the other objective and opinion evidence, the ALJ ultimately concluded that Claimant's mental impairments made it difficult for her to perform complex, highly stressful work, but that she retained the ability to work if limited to understanding, remembering, and applying information to perform simple tasks; making simple decisions; and adapting to only occasional changes in workplace routine. (Tr. at 21, 23, 32).

Unlike the ALJ in *Mascio*, the ALJ in the instant action did not simply restrict Claimant to unskilled work to purportedly account for her moderate limitations in concentration, persistence, or pace without any explanation as to how the RFC finding accounted for her functional limitations. Rather, as the Commissioner aptly points out, the ALJ tailored Claimant's RFC to her specific functional limitations and abilities. The ALJ's decision is distinguishable from *Mascio* because the ALJ thoroughly articulated her analysis of Claimant's moderate limitations in mental functioning in the RFC discussion and provided the necessary explanation and evidentiary support for her ultimate RFC conclusion.

*Mascio* itself and most cases interpreting or applying *Mascio* make clear that an ALJ is not automatically required to include certain specific restrictions in the RFC finding when the ALJ determines that a claimant has moderate limitations in concentration, persistence, or pace. *Mascio,* 780 F.3d 638; *see, e.g., Fain v. Berryhill*, No. 2:17-CV-47-FL, 2018 WL 7017913, at *13 (E.D.N.C. Dec. 19, 2018), *report and*

*recommendation adopted,* No. 2:17-CV-47-FL, 2019 WL 166824 (E.D.N.C. Jan. 10, 2019) ("The [*Mascio*] court recognized that a claimant's limitation in concentration, persistence, or pace may not translate into a limitation in the RFC."); *McNutt v. Berryhill*, No. 1:16CV00001, 2017 WL 1323471, at *7 (W.D. Va. Apr. 10, 2017) ("[T]he ALJ may find that the concentration, persistence or pace limitation would not affect [claimant's] ability to work.") *Simmons v. Berryhill*, No. 5:17-CV-00004-D, 2018 WL 577243, at *7 (E.D.N.C. Jan. 10, 2018), *report and recommendation adopted,* No. 5:17-CV-4-D, 2018 WL 576845 (E.D.N.C. Jan. 26, 2018) ("Although the ALJ's findings at step three may not require any additional limitations for concentration, persistence, or pace in the RFC, the ALJ must at least provide a sufficient explanation in the decision to allow the court to conduct meaningful review of the RFC determination."). Rather, the import of *Mascio* is that once an ALJ finds that a claimant has moderate limitations in concentration, persistence, or pace, the ALJ must sufficiently address those limitations in the RFC analysis. *Rivera v. Berryhill*, No. 3:17-CV-00376-GCM, 2019 WL 355536, at *2 (W.D.N.C. Jan. 29, 2019) ("Once an ALJ finds that Plaintiff has moderate limitations in CPP, the ALJ has two options: (1) restrict the Plaintiff's RFC to adequately account for the limitations; or (2) adequately explain his decision to not further limit Plaintiff's RFC.")

The ALJ may conclude that certain restrictions are warranted in the RFC finding to account for the claimant's deficits in concentration, persistence, or pace. Conversely, the ALJ may conclude that no additional restrictions are warranted. Either way, the ALJ must explain how the claimant's limitations were assessed and accommodated, because when the ALJ fails to address the limitations, or summarily limits the claimant to simple, unskilled work without further explanation, the reviewing court is left guessing and, as a result, is unable to conduct a meaningful review. *Mascio,* 780 F.3d at 637-38.

In this case, the ALJ fulfilled the duty of explanation and support that *Mascio* demands. Perhaps most illustrative of this point is *Keatley v. Colvin*, No. 5:15-CV-12290, 2016 WL 4539662, at *6 (S.D.W. Va. Aug. 31, 2016), a case from this district, which Claimant cited, and the Commissioner perceptively recognized to be supportive of the ALJ's decision in Claimant's case. In *Keatley*, like the present matter, the ALJ assessed that the claimant had moderate limitation in concentration, persistence, or pace and restricted the claimant's RFC to "simple tasks, simple work-related decisions, and occasional changes in work routine." *Keatley*, 2016 WL 4539662, at *3. The claimant argued that the limitations were not sufficient to accommodate a moderate difficulty in maintaining concentration, persistence, or pace. *Id*. However, the Court concluded that remand was not required "because the ALJ provided a fulsome explanation in her decision as to why the Claimant's purported limitations in concentration, persistence, or pace did not affect her ability to work." *Id*. at *6. The Court referenced the ALJ's review of  claimant's activities, noting that she could:

> [W]atch television, do laundry, perform household chores, care for her personal needs, assist her husband with the cooking, use the vacuum, read, swim, walk to her mailbox, water and 'dead-head' her flowers, shop for groceries and gifts, play Yahtzee, go to the mall, talk on the telephone, receive visits from family members, attend doctors' appointments, drive, pay bills, handle a savings account, and use a checkbook/money orders.

*Id*. Therefore, the ALJ stated that the claimant appeared to be adequately functional in the performance of routine daily tasks and was not precluded from competitive work activity. *Id*. Adding that the ALJ based such conclusion on an "exhaustive survey of the evidence on the record in the case," this Court found that the ALJ was justified in omitting any restrictions related to concentration, persistence, or pace. *Id*.

Another case that is similar to the instant matter is *Carr v. Berryhill* in which the

26

ALJ found that the Claimant had severe mental impairments of anxiety and depressive disorder. *Carr*, No. 7:17-CV-00420, 2018 WL 6272902, at *1 (W.D. Va. Nov. 30, 2018). In evaluating the claimant's mental impairments at step three of the sequential process, the ALJ determined that the claimant had moderate difficulty in the area of concentration, persistence, or pace based on her testimony that she could not deal well with stress due to anxiety. *Id.* at *5. However, the ALJ emphasized that the claimant did not report specific problems with concentration, persistence, or pace during medical examinations; that her treating practitioners never noted mental status abnormalities; the claimant enjoyed reading magazines; and none of the treating physicians opined that the claimant had functional limitations resulting from her mental health symptoms. *Id.* On judicial review, the claimant argued that the ALJ's RFC discussion was inadequate under *Mascio*. *Id.* However, upon review of the record, the court concluded that the ALJ's assessment of the claimant's mental impairments was supported by substantial evidence and that remand was not required because, although the ALJ partially credited the claimant's testimony in finding that the claimant had a moderate limitation in concentration, persistence, or pace, the ALJ sufficiently explained that the record as a whole showed that the claimant could perform simple, routine tasks of no more than four steps and that no additional restrictions were warranted. *Id.*

Like the ALJs in *Keatley* and *Carr*, the ALJ in this matter thoroughly considered the entire record and articulated that Claimant had moderate difficulties in concentration, persistence, or pace, based primarily upon Claimant's subjective allegations and Serial 3s test results during her consultative examination. Nonetheless, the ALJ determined that the weight of the evidence, including Claimant's treatment records, mental status examinations, and her ability to perform daily activities that required concentration,

persistence, or pace, indicated that Claimant was able to work with restrictions. Specifically, the ALJ concluded that the evidence demonstrated that Claimant would have difficulty performing complex, highly stressful work. Thus, the ALJ reduced Claimant's RFC to simple tasks, simple decision making, and occasional changes in work routine. In making such finding, the ALJ specifically considered and explained her basis for rejecting what was ostensibly the most conflicting evidence regarding Claimant's limitations, which was Dr. Lilly's assessment that Claimant could not sustain production quotas or frequent public contact. Overall, unlike the ALJ in *Mascio*, the ALJ considered Claimant's specific functional abilities and crafted mental RFC limitations to account for them. Indeed, the ALJ considered the work-related functions enumerated in SSR 96-8p, such as understanding, carrying out, and remembering simple instructions and dealing with changes in the routine work setting.

Therefore, for the above-reasons, the undersigned **FINDS** that the ALJ complied with the applicable law in addressing Claimant's moderate limitation in concentration, persistence, or pace in the RFC analysis.

### B. *Manipulative Impairment*

Claimant next argues that the ALJ failed to include any manipulative limitations in the RFC assessment or explain why such limitations were not warranted despite evidence in the record regarding nerve damage resulting from a burn on Claimant's right hand, as well as bilateral carpal tunnel syndrome. (ECF No. 10 at 4). The ALJ's analysis of Claimant's alleged hand impairments began at step two of the sequential evaluation. The ALJ noted that Claimant burned her right hand while making rock candy in December 2013, but that she was simply prescribed Norco and bacitracin with instructions to participate in physical therapy. (Tr. at 18). At her follow-up appointment

in January 2014, the physician noted that the small burn was minimal for the amount of pain that Claimant alleged and stated that Claimant had minimal edema in her hand and fingers, did not require any surgical intervention, and should simply continue using bacitracin ointment. (*Id.*). The ALJ further noted Claimant's complaints of numbness and tingling in her hands in May 2016, but the ALJ remarked that Claimant's subsequent EMG showed only mild bilateral carpal tunnel syndrome. (Tr. at 17). Therefore, based upon the above evidence, the ALJ found that Claimant's hand impairments were non-severe. (Tr. at 17-18).

In the RFC discussion, the ALJ considered the evidence regarding Claimant's mild carpal tunnel syndrome and right hand burn. The ALJ discussed that despite Claimant's complaints of numbness, tingling, and weakness, Claimant was able to use a hand-held cane and walker. (Tr. at 22-23, 25-26). The ALJ again noted that Claimant's EMG showed only mild carpal tunnel syndrome and that her physical examinations were largely normal. (Tr. at 25-27). The ALJ did not, as Claimant contends, ignore or discount the medical evidence concerning Claimant's hand impairments in formulating Claimant's RFC. (ECF No. 10 at 5). Rather, the ALJ expressly considered such evidence and her rationale for not assessing any manipulative limitations is readily apparent from the decision.

The ALJ's decision to not assess any manipulative restrictions is supported by substantial evidence. On December 21, 2013, Claimant burned her right hand while making rock candy. It was a minor second-degree burn on two percent of her hand for which Claimant saw only a physician's assistant and was prescribed a pain reliever and antibiotic ointment. (Tr. at 278). By January 2, 2014, the burn was healed and there was no sign of infection. (Tr. at 438). Claimant had some minimal edema in her hand and

fingers, but the physician, who specialized in burn surgery, specifically noted in the clinical record that it was a minimal burn for the amount of pain Claimant was alleging. (Tr. at 439). Claimant was not prescribed any additional pain medication. (*Id.*). Claimant complained of decreased sensation and reduced range of motion in her right hand and pursued physical therapy. (Tr. at 332). Her examination by Ms. Lambert on January 14, 2014 showed limited range of motion in Claimant's right hand and fingers and reduced sensation in the median/ulnar portion of her right hand, but Claimant had normal motor strength and tone; no contractures, malalignment, tenderness, bony abnormalities, or cyanosis; and she could perform the finger-to-nose test. (Tr. at 333). Later that month, Claimant told Ms. Lambert that she filed for disability due to the burn on her right hand and she alleged that she could not complete activities of daily living with her right hand. (Tr. at 325). Yet, Claimant's sensation was grossly intact. (Tr. at 326). In February 2014, Claimant told a mental health provider that she had "no feeling" in her right hand after burning it. (Tr. at 283). However, when Claimant told Ms. Lambert again in April 2014 that she could not complete activities of daily living on her own, Ms. Lambert documented that she saw no reason that Claimant could not care for herself, if given physical therapy and encouraged to complete tasks. (Tr. at 321-22). In June 2014, Claimant still complained of right hand pain, but Ms. Lambert did not assess any diagnoses or treatment for that complaint. (Tr. at 362-63). Much later, in May 2016, Claimant expressed a new complaint of numbness and tingling in the outer edges of her hands and feet. (Tr. at 527). Her EMG showed only mild carpal tunnel syndrome. (Tr. at 523).

The ALJ correctly considered and weighed the above evidence. Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456. As stated by

Claimant, SSR 96-8p required the ALJ to provide a narrative discussion describing how the evidence supported her RFC assessment, citing specific medical facts and nonmedical evidence. (ECF No. 10 at 4). Further, the ALJ was obligated to resolve any material inconsistencies or ambiguities in the record. (*Id.*). The ALJ undoubtedly fulfilled such obligation in assessing Claimant's hand impairments.

Therefore, the undersigned **FINDS** that the ALJ's RFC assessment concerning Claimant's hand impairments is supported by substantial evidence.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 31, 2019

Cheryl A. Eifert
United States Magistrate Judge